### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### GREENSBORO DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MICHAEL D. RHOADES and | ) | Case No. 08-10758 |
| ANGELA E. RHOADES, | ) | |
| | ) | |
| Debtors. | ) | Chapter 7 |
| _____ | ) | |

### MEMORANDUM OPINION

This matter came before the Court on December 11, 2008 upon the Motion of

Bankruptcy Administrator for Dismissal of Case Pursuant to Sections 707(b)(1) and 707(b)(3)

(the "Motion to Dismiss") filed by the United States Bankruptcy Administrator on July 21, 2008.

At the hearing, J. Marshall Shelton appeared on behalf of the above-referenced debtors (the

"Debtors") and Robert E. Price, Jr. appeared on behalf of the Bankruptcy Administrator.  After

consideration of the Motion to Dismiss, the evidence presented at the hearing, the arguments of

the parties, and the relevant law, the Court will grant the Motion to Dismiss.

### I.  JURISDICTION

The Court has jurisdiction over the subject matter of this proceeding pursuant to 28

U.S.C. §§ 151, 157 and 1334, and the General Order of Reference entered by the United States

District Court for the Middle District of North Carolina on August 15, 1984.  This is a core

proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) which this Court has the jurisdiction

to hear and determine.

## II.  FACTS

On May 21, 2008, the Debtors filed for bankruptcy relief under Chapter 7 of the Bankruptcy Code.  The Debtors are married and have two minor children.  Both Debtors testified that they filed for bankruptcy in order to save their home and because they could not pay their bills as they came due.

The main cause of the Debtors' financial plight is their home.  The Male Debtor, who was previously employed in the residential construction industry, personally designed and built the home, which was completed in October 2005.  The home has 3,327 square feet of living space, five bedrooms, and four and a half baths; it sits on a three-acre lot in a residential subdivision of Greensboro, North Carolina.  The Male Debtor financed its construction with two loans, in the amounts of $354,953.00 and $65,400.00, respectively, both secured by deeds of trust on the home.[1]  The initial monthly payments on these loans were $1,648.40 and $676.00, respectively.  On May 23, 2006, the Male Debtor executed a home equity line agreement with a maximum credit line of $153,350 (the "Home Equity Loan").[2]  The appraisal obtained in

---

[1]On October 3, 2005, the Male Debtor executed a promissory note in the amount of $354,650 (the "First Note") secured by the Debtors' residence.  The terms of the First Note require the Male Debtor to pay interest only at a fixed rate of 5.5% for the first seven years, with the rate adjusting on an annual basis for the remainder of the thirty-year term.  The First Note requires payments of principal and interest beginning on December 1, 2015.  According to the Male Debtor's monthly loan statement of August 11, 2008, the interest due, including ad valorem taxes and insurance held in escrow, was $1,958.64 and the principal balance was $359,642.06. The Male Debtor also executed a second promissory note in the amount of $65,400.00 (the "Second Note") secured by the Debtors' residence.

[2]The terms of the Home Equity Loan require the Male Debtor to pay interest only at an initial rate of 9.5% for the first ten years, with payment of principal and interest commencing on May 23, 2016.  The interest rate on the Home Equity Loan adjusts monthly.

2

connection with the Home Equity Loan, dated May 9, 2006, valued the home at $530,000.00.[3] The Debtors drew the remaining balance on their line of credit, approximately $87,950, to "complete" the home with landscaping, deck construction, painting, and sidewalks.  The Debtors' August 12, 2008 loan statement for the Home Equity Loan shows a July 2008 interest payment of $794.78, with an outstanding balance of $153,200.  The Debtors' total monthly mortgage payment on the date of filing the petition was $3,152.00.  The Debtors valued their home on Schedule A at $366,000.

Throughout the construction of the home and up until September 2007, the Male Debtor was employed in Greensboro, North Carolina as a project manager at Southern Structures, Inc., a residential construction company.  In 2006, the Debtors reported gross income of $84,563.00. The Male Debtor testified that his employer made numerous promises of raises and bonuses, but they always seemed to get pushed back year after year.  On October 1, 2007, the Male Debtor left Southern Structures, Inc. for a new position at Chapman Mechanical, Inc., earning an annual salary of approximately $90,000.00.

The Female Debtor has not been employed full-time since 1995.  While the Female Debtor has held seasonal positions and worked part-time, she has never made a significant contribution to the Debtors' income.[4]  On November 1, 2007, the Female Debtor began working

---

[3]The home includes such amenities as multiple fireplaces, vaulted ceilings, a covered front porch, a garden tub, and a wet bar.

[4]In 2007, the Female Debtor earned $4,005.63 working at a CPA firm as a seasonal tax preparer and $560.00 at Skybus Airlines, for a total gross income of $4,565.63.  The Female Debtor testified that in 2008, she earned between $800.00 and $1,000.00 preparing taxes and between $400 and $500 at Skybus Airlines.  By comparison, in 2007 the Male Debtor earned $59,400.00 at Southern Structures, Inc. and $20,769.24 at Chapman Mechanical, Inc. for a total gross income of $80,169.24.  As of May 21, 2008, the Male Debtor had earned $31,153.86.

3

at Skybus Airlines as a flight attendant, but she had to quit in January of 2008 because of medical problems associated with air travel. Shortly thereafter, Skybus Airlines went out of business. As of the day of the hearing, the Female Debtor is still seeking employment that revolves around her children's schedules.

Before the house was constructed, the Debtors used credit cards but were always able to pay down the balances. However, after the completion of their home in October of 2005, the Debtors amassed a considerable amount of unsecured debt. The Debtors used credit cards to supplement their income, eventually making only minimum payments. The Debtors also used convenience checks to transfer credit card balances from one card to another. By the end of 2007, the Debtors had fallen behind on their credit card payments. According to Schedule F, as of March 2008, the Debtors owe $93,917.72 to their unsecured creditors, consisting entirely of outstanding balances on nineteen credit cards. The Debtors also incurred approximately $10,243 in interest and late fees between March 2008 and May 21, 2008, for a total of $104,160.72. Since the end of 2006, the Debtors have opened three new charge accounts with balances that alone total $16,327.35.

On May 21, 2008, the Debtors filed their Chapter 7 bankruptcy petition. The Debtors' schedules reflect a monthly net income of $5,405.10 and expenses of $6,156.60, resulting in a deficit of $751.50. According to Schedule J, the Debtors have a $3,152.00 mortgage payment. The Debtors also spend $764.55 in utilities, $30.00 for homeowners' association dues, and $20.00 for home maintenance, resulting in a monthly housing expense of $3,966.55, which is approximately seventy-three percent (73%) of the Debtors' monthly net income. The Debtors lease a 2006 Hummer. The Male Debtor uses his employer's truck for work purposes only. The

4

Debtors have no retirement or savings plans for them or for their two children.

At the hearing, the Bankruptcy Administrator submitted an amended Schedule J to reflect the Debtors' current expenses of $5,175.28, which is a decrease of $981.32 per month. The payment on the Debtors' second mortgage decreased by $487.60 due to a decline in the interest rate. The Debtors were also able to reduce their utilities by $226.79. The remaining deductions were the result of various efforts to cut unnecessary expenses such as enrolling in the Male Debtor's employer-sponsored health insurance program, reducing charitable contributions, and changing life insurance policies. As a result of these changes, the Debtors' monthly housing expense totals $3,302.16, which is approximately sixty-one percent (61%) of the Debtors' monthly net income.

On July 1, 2008, the Bankruptcy Administrator filed a Statement that no Presumption of Abuse has Arisen Under 11 U.S.C. § 707(b)(2), but on July 21, 2008, the Bankruptcy Administrator filed the Motion to Dismiss based on Section 707(b)(3) of the Bankruptcy Code. The Bankruptcy Administrator argues that the Debtors have an excessive budget due to their high mortgage payment, that they have an ability to repay their debts, and that they made consumer purchases far in excess of their ability to pay.

### III. DISCUSSION

The Bankruptcy Administrator seeks dismissal of the Debtors' case pursuant to Section 707(b)(3) of the Bankruptcy Code. Abuse of the Bankruptcy Code occurs under Section 707(b) when a debtor attempts to use the provisions of the Code to get a "head start" rather than a "fresh start." Green v. Staples (In re Green), 934 F.2d 568, 570 (4th Cir. 1991) (providing that Section 707(b) allows "a bankruptcy court to deal equitably with the situation in which an unscrupulous

5

debtor seeks to gain the court's assistance in a scheme to take unfair advantage of his creditors."); In re Schmonsees, No. 01-10844, slip op. at *5 (Bankr. M.D.N.C. Sept. 21, 2001) (2001 WL 1699664) ("Section 707(b) should be applied in a manner in which a truly needy debtor is allowed a fresh start, while denying a head start to the abusers."). For Section 707(b) to be applicable, the debts in the case must be primarily consumer debts, and it must be shown that granting the debtor a Chapter 7 discharge would involve an "abuse" of the provisions of Chapter 7. It is undisputed that the debts in this case are primarily consumer debts. The moving party, in this case the Bankruptcy Administrator, has the burden of proving abuse pursuant to Section 707. In re Sale, No. 06-51290, slip op. at *3 (Bankr. M.D.N.C. Oct. 15, 2007) (2007 WL 3028390); In re Quarterman, 342 B.R. 647, 652 (Bankr. M.D. Fla. 2006) (citing In re Heath, 182 B.R. 557, 561 (B.A.P. 9th Cir. 1995)).

Section 707(b)(1) of the Bankruptcy Code prescribes two alternative standards to determine whether the granting of relief would be an abuse. First, Section 707(b)(2) provides that abuse may be presumed if, under a "means test" formula, the debtors' 60-month disposable income exceeds a particular threshold amount.[5] Second, Section 707(b)(3) provides that, even if no presumption of abuse arises, a court may still dismiss a case based upon the particular circumstances of the case. The Bankruptcy Administrator does not assert that the Debtors failed the means test of Section 707(b)(2). The Court need only address whether there is a basis to dismiss the case under Section 707(b)(3).

---

[5]Section 707(b)(2)(A)(I) states: "In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter, the court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of–(I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $6,575, whichever is greater; or (II) $10,950."

Section 707(b)(3) requires a court to consider "(A) whether the debtor filed the petition in bad faith; or (B) [whether] the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse."  Unlike the pre-BAPCPA version, "§ 707(b)(3) does not require a showing of 'substantial abuse,' but a lower standard of 'abuse.'"  <u>In re Mondragon</u>, No. 05-10665, slip op. at *1 (Bankr. D.N.M. Aug. 24, 2007) (2007 WL 2461616); <u>In re Mestemaker</u>, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007); <u>see also</u> <u>In re Colgate</u>, 370 B.R. 50, 56 (Bankr. E.D.N.Y. 2007) (acknowledging that BAPCPA lowered the standard from "substantial abuse" to "abuse" but finding it appropriate to apply the pre-BAPCPA two part test for determining substantial abuse in evaluating a motion to dismiss under § 707(b)(3)).

Section "707(b)(3) incorporates a 'totality of the circumstances' standard, which courts previously employed as the standard for determining whether to dismiss a debtor's chapter 7 proceeding based on 'substantial abuse' under pre-BAPCPA § 707(b)(2)."  <u>Mondragon</u>, slip op. at *1; <u>see</u> <u>Green</u>, 934 F.2d at 572.  Pre-BAPCPA cases, such as <u>Green</u>, are still instructive under Section 707(b)(3).  <u>See</u> <u>In re dePellegrini</u>, 365 B.R. 830, 832 (Bankr. S.D. Ohio 2007); <u>In re Pfiefer</u>, 365 B.R. 187, 191 (Bankr. D. Mont. 2007); <u>In re Schoen</u>, No. 06-20864, slip op. at *2 (Bankr. D. Kan. Mar. 2, 2007) (2007 WL 643295).  <u>But see</u> <u>In re Henebury</u>, 361 B.R. 595, 606-607 (Bankr. S.D. Fla. 2007) (doubting the post-BAPCPA validity of <u>Green</u> and concluding that, because pre-BAPCPA cases applying a "totality of circumstances" standard for substantial abuse consider ability to pay conjunctively with bad faith, while § 707(b)(3) separates the "bad faith prong" from the "totality of circumstances" prong, pre-BAPCPA cases finding that "totality of circumstances" requires something more than an ability to pay do not provide guidance to post-BAPCPA cases under the "totality of circumstances" prong, and holding that "ability to

pay, standing alone, is sufficient to warrant dismissal of a Chapter 7 case for abuse pursuant to

11 U.S.C. § 707(b)(3)(B).").  <u>Green</u> remains instructive in an analysis pursuant to new Section

707(b)(3).  <u>See</u> <u>Mondragon</u>, slip op. at *1.

      Under <u>Green</u>, a court is to determine whether to dismiss a case for abuse of Chapter 7 by

considering the totality of the circumstances.  <u>Green</u>, 934 F.2d at 572.  The Fourth Circuit held

that in considering the totality of the circumstances, a court should consider the debtor's ability

to repay his or her debts, as well as review the following factors:

> (1)  Whether the bankruptcy petition was filed because of sudden illness,
> calamity, disability or unemployment;
> (2)  Whether the debtor incurred cash advances and made consumer purchases far
> in excess of his ability to repay;
> (3)  Whether the debtor's proposed family budget is excessive or unreasonable;
> (4)  Whether the debtor's schedules and statement of current income and expenses
> reasonably and accurately reflect the debtor's true financial condition; and
> (5)  Whether the petition was filed in good faith.

<u>Id.</u>  The Fourth Circuit also stated "that the majority of the cases hold that the debtor's ability to

repay is the primary factor to be considered."  <u>Id.</u>

### A. Excessive or Unreasonable Family Budget

      Courts look to the facts of a case to determine whether debtors have an excessive or

unreasonable family budget.  The Bankruptcy Administrator argues that the Debtors' housing

payment alone renders their budget unreasonable and, given the Debtors' current income, their

house is just too expensive.  The Debtors argue that their budget is in line with IRS standards.

      A debtor's budget may be excessive or unreasonable based on a high mortgage payment.

<u>E.g.</u>, <u>In re Moreland</u>, No. 05-10519, slip op. at *5-6 (Bankr. M.D.N.C. Aug. 3, 2005) (2005 WL

1925460) (finding that mortgage payments of $2,604 on a $240,000 house with no equity,

consuming a large percentage of their monthly income, was unreasonable; <u>Shaw v. United States</u>

8

Bankr. Adm'r (In re Shaw), 310 B.R. 538, 541 (M.D.N.C. 2004) (finding that the debtors earned $7,804.11 in net monthly income and that a mortgage payment of $3,349 on a $415,000 house was unreasonable in that it manifested a desire to hold on to a station in life that seemed to precipitate the bankruptcy in the first place); Schmonsees, slip op. at *3 (holding that mortgage payments of $2,450 on a $290,000 four-bedroom home in an upscale neighborhood occupied by two people was excessive when the debtor and his non-filing spouse earned a net pay of $5,400 per month); In re Engskow, 247 B.R. 314, 317 (Bankr. M.D. Fla. 2000) (stating that mortgage, taxes, and insurance expenses of $2,184.53 were excessive when the debtor's net income was $3,548.40 and when the debtor did not include the income of his spouse on the schedules); United States Trustee v. Duncan (In re Duncan), 201 B.R. 889, 896 (Bankr. W.D. Pa. 1996) (finding a mortgage and utility expenses consuming 89% of the household budget was unreasonable and unconscionable, considering the debtor was attempting to wipe out nearly $224,000 in unsecured indebtedness); cf. In re Hammed, No. 04-53282, slip op. at *5 (Bankr. M.D.N.C. April 22, 2005) (2005 WL 1321943) (finding that a $1,740 mortgage payment for a family of five that constituted 31% of the budget was not unreasonable); In re Parker, 04-12747, slip op. at *6 (Bankr. M.D.N.C. Jan. 25, 2005) (2005 WL 1288974) ("Given the length of time that the Debtor has owned her home, the size of her family, the relative cost of alternative housing, and the relatively modest living conditions of the Debtors, the Court is convinced that the Debtor did not inflate her homestead costs in an effort to live an indulgent and luxuriously lifestyle at the expense of her unsecured creditors."); In re Vansickel, 309 B.R. 189, 199-200 (Bankr. E.D. Va. 2004) (finding that $2,300 per month in rent was not excessive for a family of four in a three-bedroom townhouse when the debtor's net income was $5,287 per month).

9

In considering whether housing expense are excessive, due regard should be given to the size of the family, their reasonable needs, and the cost of alternative housing.  Furthermore, a court should not unduly depreciate a debtor's long-standing, traditional ties to a homestead.  See In re Miller, 335 B.R. 335, 342 (Bankr. E.D. Pa. 2005); In re Beitzel, 333 B.R. 84, 90 (Bankr. M.D.N.C. 2005); Moreland, slip op. at *5-6.

In this case, the Debtors built their home in 2005 by borrowing approximately $420,050.00.  Seven months later, the Debtors borrowed an additional $87,950.00 on a home equity line of credit, for a total initial indebtedness of approximately $508,000.00.  The Debtors' home has five bedrooms, measures 3,327 square feet, and is situated on three acres of land.  The Debtors reside in the home with their two thirteen-year-old sons.  According to the Debtors' schedules, the home is worth $366,000, although the Male Debtor testified that he is unsure whether the home would sell for that much.  Currently, the two mortgages total $512,842.00. There is clearly no equity in the property.  The Debtors' total monthly mortgage payment according to amended Schedule J is $2,664.40, or approximately forty-nine percent (49%) of the Debtors' net monthly income.[6]  In addition, the Debtors' are currently spending $637.76 each month on utilities, homeowners' association dues, and home maintenance, which is a reduction of $176.79 from their original Schedule J.  Therefore, $3,302.16 of the Debtors' monthly net income is allocated toward housing expenses, which approximately sixty-one percent (61%) of the total.

---

[6]The Court notes that the Debtors mortgage payment is comprised only of interest.  Once the Debtors are required to start paying principal and interest, approximately 6 years from now, their mortgage payment will increase substantially.  The Court also notes that the reduction in the Debtors' mortgage payment was due to a fortuitous reduction in the interest rate, and it is just as likely that this amount will increase in the future.

10

The Court finds that the Debtors' housing expense is excessive.  First, the Debtors have a five-bedroom, 3,327 square foot home for a family of four.  No unique circumstances exist to explain why such a large amount of space is needed.  Second, the Debtors do not have any long-standing traditional ties to their homestead, as the house was newly constructed in 2005.  Third, there is no equity in the home.  Finally, according to IRS guidelines, housing and utilities for a family of four in Guilford County, North Carolina should be no more than $1,649.00 per month, less than half of what the Debtors are currently spending.[7]  The Debtors can find suitable housing for their family that would cost significantly less than their current home.  The Court concludes that the Debtors' budget is excessive and unreasonable.  This factor shows abuse.

### B. Ability to Repay

The Bankruptcy Administrator argues that if the Debtors were to obtain more affordable housing, then they would be able to repay some of their debts.  An appropriate method of evaluating whether a debtor has the ability to repay his or her debts is to determine what amount of that indebtedness could be repaid in a hypothetical Chapter 13 plan.  In re Behlke, 358 F.3d 429, 437 (6th Cir. 2004) (substantial abuse found where the debtors could pay a dividend of 14% to 23%); In re Lipford, 397 B.R. 320, 328 (Bankr. M.D.N.C. 2008) (no bright line test); Shaw,

---

[7]The Debtors argue that their expenses are in line with IRS standards once other factors are taken into consideration, such as living expenses and vehicle ownership and operating costs. However, the argument is not persuasive.  The Debtors compare their actual expenses to an average family of four residing in North Carolina, including the cost of owning and maintaining two vehicles.  The total cost to own and maintain two vehicles, according to IRS standards, is $1,380.00 per month.  By contrast, the Debtors only spend $654.40 a month to own and maintain their vehicle.  The cost difference, the Debtors argue, cancels out the Debtors' high mortgage and utilities expenses and brings their total expenses in line with the average family.  This analysis ignores the fact that the Debtors only have one vehicle.  By applying the cost of owning and maintaining two vehicles, the Debtors are artificially inflating the percentage of monthly income that an average family spends each month.

310 B.R. at 342 (dividend of 29% over 36 months was found to be a significant portion of the debtors' debts); In re Norris, 225 B.R. 329, 332-33 (Bankr. E.D. Va. 1998) (substantial abuse found where debtors had ability to repay 47% of debt through a Chapter 13 plan); In re Vianese, 192 B.R. 61, 71 (Bankr. N.D.N.Y. 1996) (finding substantial abuse where debtors could pay 19% to unsecured creditors in Chapter 13); In re Jarrell, 189 B.R. 374, 376 (Bankr. M.D.N.C. 1995) (substantial abuse indicated where debtors could pay 80% of debt over 36 months); In re Bryant, 47 B.R. 21, 23 (Bankr. W.D.N.C. 1984) (substantial abuse indicated where debtor, "with only a modicum of restraint," could pay 67% of his unsecured obligations over a 36-month period). But see In re Stewart, 383 B.R. 429, 435 (Bankr. N.D. Ohio 2008) (finding no abuse where debtor potentially could pay a 35% over 60 months).

The greater the ability to pay, the more likely the finding of abuse. See In re Praleikas, 248 B.R. 140, 145 (Bankr. W.D. Mo. 2000) ("While it may be true that the higher the percentage of debt a Debtor could pay with future earnings, the more likely it is that a court would find substantial abuse, the converse is not true. Otherwise debtors would be rewarded for having more debt, rather than less. Instead of the percentage of debt, the determination of a debtor's ability to fund a Chapter 13 plan is based on a consideration of the debtor's ability to make a substantial effort in repaying his or her debts."). However, an ability to pay is not per se abuse. See In re Mondragon, slip op. at *6 (citing Mestemaker, 359 B.R. at 858) (examining the Green factors post-BAPCPA and noting that the ability of a debtor to pay at least a 25% dividend to unsecured creditors in a Chapter 13 case is not per se abuse under Section 707(b)(3)). However, the Mondragon court found that "a debtor's ability to repay 25% or more of his or her unsecured non-priority debts in a Chapter 13 plan is persuasive evidence" of abuse. Id. (emphasis added).

12

The court noted that "a debtor's ability to pay is the primary factor even under pre-BAPCPA 'substantial abuse' cases." Id. Ultimately, an ability to pay tends to show abuse. See Lipford, 397 B.R. at 332-33.

### 1. The Debtors' Original and Amended Schedules I and J

The Court will evaluate the Debtors' ability to pay by considering their income and expenses as reported on their Schedules I and J. See Lipford, 397 B.R. at 328. The Court must look to the Debtors' future income and expenses, as well as evaluate their financial condition at the time of filing. Id. According to Schedule I, the Debtors had a combined average monthly income of $5,405.10. The Debtors' original Schedule J showed average monthly expenses totaling $6,156.60, leaving a net monthly income of negative $751.50. The Debtors' amended Schedule J shows a decrease in their monthly expenses of $981.32, leaving a net monthly income of $229.82.

### 2. The Debtors' Income on Schedule I

At the hearing, the Male Debtor testified that his income on Schedule I was based on receiving two paychecks each month or twenty-four pay periods each year. The Male Debtor further testified that he actually receives paychecks every other Friday, which is twenty-six pay periods each year. This results in the Male Debtor receiving an average net monthly income of $5,855.52, rather than $5,405.10, an increase of $450.42.

The Debtors' Schedule I does not show any income for the Female Debtor. The Debtors' Form B22A shows a current monthly income of $93.33. The Female Debtor testified that she is currently seeking full time employment and has agreed to return to her former employer as a seasonal tax preparer. In 2007, the Female Debtor reported $3,505.32 net income from this

13

position.  In 2008, the Female Debtor earned between $800 and $1,000 in the two weeks she worked as a tax preparer.  If she works the full tax season, as planned, the Female Debtor could contribute approximately $292.00 to the Debtors' total monthly income.  Based on the foregoing, the Debtors' Schedule I should be adjusted to $6,147.52.

### 3.  The Debtors' Expenses on Their Amended Schedule J

It is appropriate for the Court to consider whether the expenses claimed by a debtor can be reduced significantly without depriving the debtor of adequate food, clothing, shelter, or other necessities of life.  In re McCain, No. 05-14382, slip op. at *3 (Bankr. M.D.N.C. June 16, 2006) (2006 WL 4458679) (citing Engskow, 247 B.R. at 317).  The Bankruptcy Administrator argues that the Court should reduce the Debtors' budget to a reasonable amount, using the IRS standards as a guide.  As stated, the Court believes that the Debtors' housing expenses are excessive, and that they could obtain alternative housing for $1,649.00 per month, resulting in an additional $1,653.16 in monthly disposable income.

The Bankruptcy Administrator further argues that the Court should look at the Debtors' amended Schedule J with skepticism.  Any amendment that a debtor makes to Schedule I or J subsequent to a motion to dismiss under Section 707(b) is viewed with inherent suspicion. Lipford, 397 B.R. at 329; Stewart, 383 B.R. at 433 ("[S]elf-serving amendments . . . which are made in direct response to an unfavorable action, are not viewed favorably.  Debtors are expected, on their own accord, to correct errors in their schedules; not just when faced with a Motion to Dismiss or other adverse action.").  The Court does not believe that the Debtors' amendments are self-serving, but rather are the result of conscious efforts to reduce their expenses.

14

The Debtors' argue against the sale of their home because it would produce a large deficiency that would have to be repaid in a Chapter 13 plan, thereby diluting the payout to other creditors. The Court finds this argument unpersuasive. Under Section 1325(a)(4), unsecured creditors must receive as much value in a Chapter 13 plan as they would have received in a Chapter 7 liquidation. Here, unsecured creditors will receive significantly more in a Chapter 13 plan. As one court put it, "less of something is better than more of nothing." In re Blankenship, No. 08-30226, slip op. at *3 (Bankr. N.D. Ohio May 15, 2008) (2008 WL 2076736).

### 4. Conclusion

The Debtors' income on Schedule I should be increased by $742.42 due to their improper calculations of income. The Debtors' expenses on Schedule J should be reduced by $1,653.16 due to their excessive housing expenses. After making these adjustments, the Debtors are able to pay $2,625.40 each month toward their unsecured debts, which would provide a dividend of approximately a 62% to their unsecured creditors over sixty months in a Chapter 13 plan.[8] This factor shows abuse.

### C. Accuracy of Schedules

Inaccuracies on a debtor's schedules tend to show abuse. See Lipford, 397 B.R. at 338. In this case, the Bankruptcy Administrator has demonstrated several inaccuracies on the Debtors' schedules. These inaccuracies include improperly calculating the Male Debtor's income and understating their unsecured debts. These inaccuracies tend to show abuse.

---

[8]The projected plan dividend is based upon unsecured debts totaling $254,315.72. Using the value of the Debtors' home listed on their Schedule A, a $150,155 deficiency would result from its sale. As of the petition date, the Debtors owe $104,160.72 to unsecured creditors. As above-median income debtors, the Debtors' applicable commitment period in a Chapter 13 plan is not less than five years. 11 U.S.C. § 1325(b)(4)(A)(ii)(II).

15

### D. Sudden Illness, Calamity, Disability, or Unemployment

The Court finds that the Debtors did not file their bankruptcy due to sudden illness, calamity, disability, or unemployment. While the Female Debtor was unable to work as a flight attendant because of medical issues, her loss of employment did not result in a significant loss of income. See Schmonsees, slip op. at *3 (holding that a co-debtor's unemployment, without a significant loss of income, did not force the debtors into bankruptcy). The Female Debtor has not worked full time in 12 years. Further, the Debtors' annual income increased from 2006 to 2007, and the Debtors are projected to earn even more income in 2008 because the Male Debtor received an increase in pay at his new job. This factor tends to show abuse.

### E.  Cash Advances and Consumer Purchases in Excess of Ability to Repay

A debtor's ability to repay consumer purchases and cash advances should be interpreted in a manner consistent with a debtor's reasonable expectations of repayment at the time that the debt was incurred. Beitzel, 333 B.R. at 91 (citing Vansickel, 309 B.R. at 211); Moreland, slip op. at *7. "Taken in its proper context, a court should examine the nature of the debts incurred, if the debts were consistent with the debtor's financial status, and whether there was an unexplained change in spending patterns--all of which must be considered in light of whether a debtor is taking unfair advantage of creditors." Beitzel, 333 B.R. at 91 (internal citations omitted). However, paying the minimum balance on a credit card does not demonstrate an ability to repay debts. Moreland, slip op. at *8. In this case, there is no dispute that the debts in this case are primarily consumer debts, so the only issue is whether those purchases were in excess of their ability to repay.

As of the petition date, the Debtors accumulated $104,160.72 in unsecured debts. Their

16

unsecured debts consist entirely of credit card debts. In the eighteen months prior to filing their petition, the Debtors opened three additional charge accounts, accumulating an additional $16,327.35 in unsecured debt. The Debtors also used numerous balance transfers to defer payment of their unsecured debt. The Debtors eventually resorted to paying only the minimum balance due on their credit accounts. Between December of 2007 and February of 2008, the Debtors defaulted on all nineteen credit accounts. In sum, the Debtors used credit cards to finance their consumer purchases at a time when they did not have the ability to repay the debt, apparently believing that the Male Debtor was going to receive a raise at some undetermined future date. These facts tend to show abuse.

### F. Good Faith

The Bankruptcy Administrator does not allege that the Debtors did not file their petition in good faith. The Court concludes that the Debtors filed their petition in good faith.

### IV. CONCLUSION

The standard for granting a motion to dismiss pursuant to Section 707(b)(3) is no longer "substantial abuse," but rather just "abuse," a lower standard. The Debtors have an excessive budget due to their unreasonable housing expenses. They have the ability to pay $2,625.40 per month to their unsecured creditors in a Chapter 13 plan, which would constitute a 62% dividend over five years. The inaccuracies on the Debtors' schedules tend to show abuse. The Debtors did not file due to sudden illness, calamity, disability, or unemployment, nor did they file their petition in bad faith. Based on the totality of the circumstances and the lower standard of abuse under BAPCPA, the Court finds that allowing the Debtors to continue in a Chapter 7 would constitute an abuse of the Bankruptcy Code within the meaning of Section 707(b)(3).

17

This opinion constitutes the Court's findings of fact and conclusions of law.  A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**GREENSBORO DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MICHAEL D. RHOADES and | ) | Case No. 08-10758 |
| ANGELA E. RHOADES, | ) | |
| | ) | |
| Debtors. | ) | Chapter 7 |
| _____ | ) | |

**<u>PARTIES IN INTEREST</u>**

Michael and Angela Rhoades

J. Marshall Shelton, Esq.

Robert E. Price, Jr., Bankruptcy Administrator

Everett B. Saslow, Jr., Chapter 7 Trustee